Anita L. Steburg, State Bar No. 245933
STEBURG LAW FIRM, PC
1798 Technology Drive, Suite 258
San Jose, CA 95110
Phone (408) 573-1122
Fax (408) 573-1126

Attorney for Plaintiffs
TODD S. GLASSEY and
MICHAEL E. MCNEIL

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TODD S. GLASSEY<br><br>and<br><br>MICHAEL E. MCNEIL,<br><br>                    Plaintiffs,<br><br><br>        vs.<br><br><br>SYMMETRICOM, INC.<br>                    Defendant. | CASE NO.<br><br>JUDGE<br><br><br>**COMPLAINT**<br><br>**Jury Demand Endorsed Hereon** |

For their Complaint, Plaintiffs Todd S. Glassey and Michael E. McNeil state as follows:

1.      Plaintiffs are individuals who were, for all times relevant hereto, residents of Santa Cruz County, California.

2.      Defendant Symmetricom, Inc. ("**Symmetricom**"), is, on information and belief, a Delaware corporation with its principal place of business in San Jose County, California.

3.      Symmetricom did, on information and belief, acquire the assets and liabilities of Datum, Inc. ("**Datum**"), in 2002.

COMPLAINT

4.      Datum did, on information and belief, acquire the assets and liabilities of Digital Delivery, Inc. ("**DDI**") in or about July 1999.

5.      Symmetricom is, on information and belief, the successor in interest for any liabilities of Datum and DDI to Plaintiffs.

## JURISDICTION AND VENUE

6.      This Court has original subject matter jurisdiction over this suit pursuant to 28 USC § 1338 because the matters in it relate to patents.

7.      This Court has subject matter jurisdiction over the remaining claims at issue in this suit pursuant to is supplemental jurisdiction as codified by 28 USC § 1367 because they form part of the same case and controversy as those claims relating to patents.

8.      This Court has personal jurisdiction over this matter because the Plaintiffs reside in this judicial district and a substantial portion of the events below took place in this district.

9.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the acts or omissions giving rise to the claims at issue in this dispute occurred in this district.

## STATEMENT OF OPERATIVE FACTS

10.      This Complaint is being brought in the United States District Court because there are issues in dispute between the parties which require the Court to construe the claims of certain US Patents and applications for patents which confers exclusive jurisdiction for central components of this dispute to the federal judiciary.

COMPLAINT

11.     Prior to the filing of this Complaint in this Court, the Plaintiffs and Symmetricom were parties to a California Superior Court suit captioned *Michael E. McNeil, et al. v Symmetricom, et al.*, which was dismissed without prejudice to any of the claims therein and proceeded as that Court's Case No. CV 165643 (the "State Court Lawsuit").

12.     The State Court Lawsuit could not continue to be prosecuted in California Superior Court because, as that case developed, it because apparent that the California Superior Court would be required to construe US Patent claims and claims in patent applications in order to render any judgment on the claims for relief Plaintiffs brought, and that Court lacked the subject matter jurisdiction to do so.

13.     Plaintiffs are computer scientists with expertise in the design, development, and implementation of timekeeping technologies for use in a variety of security, commerce, and communications systems with a special focus on digital evidence systems focusing on location and time infrastructure.

14.     Symmetricom, for itself and as successor in interest to Datum and DDI, is in the business of commercializing timekeeping technologies for use in various markets.

**Plaintiffs' Relationship with Datum**

15.     In or about October 1997, Plaintiff Glassey approached Datum to manufacture a component of the time controls for an email and document control gateway of Glassey's design.

16.     Further to that discussion between Plaintiff Glassey and Datum, and to facilitate a discussion concerning whether Datum and Glassey might undertake broader business efforts

3

COMPLAINT

together, Datum and Glassey entered into a mutual nondisclosure agreement in November 1997 (the "**Datum NDA**").

17.     In the months following the execution of the Datum NDA, Glassey and Datum had a variety of conversations concerning whether and how they would work together to develop new and useful technologies.

18.     In early 1998 Plaintiff Glassey was joined in his commercial efforts by Plaintiff McNeil in Glassey's new company known as GMT.

19.     On or about May 4, 1998, Plaintiffs each executed a consulting agreement with Datum for the purpose of securing certain technical consulting services (the "**Datum Consulting Agreements**"), true and correct copies of which are attached as Exhibits A and B hereto.

20.     The Datum Consulting Agreements were effective from May 4, 1998, to July 4, 1998, and during that period Plaintiffs provided services to Datum exclusively relating to market analysis to support Datum's developing e-commerce division.

21.     Upon the expiration of the Datum Consulting Agreements, Plaintiffs and Datum agreed to continue to work together without further written agreements with the understanding, based on the existing Datum NDA, that Plaintiffs would own any and all intellectual property developed by them or shared by them during the term of the continuing relationship and that Plaintiffs would be independent contractors for Datum.

22.     Among the tasks Plaintiffs agreed to take on as independent contractors for Datum after July 4, 1998, were the identification of potential acquisition targets for Datum as it sought to expand its e-commerce business.

**Plaintiffs' Relationship With DDI**

COMPLAINT

23.     From approximately December 1997 onward, Plaintiffs worked to develop other relationships in the industry for the purpose of commercializing their time control technologies.

24.     One of the companies that Plaintiffs developed a relationship with was DDI.

25.     Plaintiffs first collaborated with DDI for purposes of obtaining support and assistance in the filing and prosecution of various patent filings.

26.     DDI and Plaintiffs worked in 1997 and 1998 to enhance DDI's so-called **Confidential Courier** product with various aspects of Plaintiffs' time control technologies.

27.     At some time in July 1998, Plaintiffs and DDI decided to pursue a U.S. Patent application which would incorporate some of Plaintiffs' time control technology with some of DDI's existing Confidential Courier technology which was the subject matter of an existing U.S. Patent.

28.     The new U.S. Patent which DDI and Plaintiffs envisioned was to be known as the **Controlling Access Patent** and DDI and Plaintiffs sought to formalize an agreement which would allow for the most prompt filing of the application for the Controlling Access Patent.

### The 1998 Co-Inventor Agreement

29.     Effective on or about October 26, 1998, Plaintiffs and DDI entered into an agreement known as the **Co-Inventor Agreement**, a copy of which is attached hereto as Exhibit C.

30.     According to Recital D the Co-Inventor Agreement, its purpose was:

> [T]o allow the Controlling Access Patent application to be submitted as early as possible and prior to a definitive agreement between the parties with respect to each party's rights to exploit the Controlling Access Patent, the respective mutual and exclusive rights to the underlying or derivative technology, methodology, or other patentable subject matter contained or referenced in the Controlling Access Patent, and the compensation to be paid by Digital to Glassey-McNeil for assignment of certain rights therein to Digital.

COMPLAINT

31.     Recital A of the Co-Inventor Agreement commemorated DDI's ownership of the Confidential Courier product.

32.     Paragraph 1.C. of the Co-Inventor Agreement commemorated that Plaintiffs developed and provided to the Controlling Access Patent application technologies including "**GPS Phase II**" which specifically included, "a cryptographic signing and verification process with the transmittal of time and geographic positioning information that allows a legally indemnifiable degree of trust to be established in the time and geographic positioning information thus conveyed."

33.     Paragraph 2.A. of the Co-Inventor Agreement provided further that, "[DDI] acknowledges that the GPS Phase II technology is solely and exclusively the idea and invention of [Plaintiffs]."

34.     The Co-Inventor Agreement explicitly contemplated that a future "definitive" agreement would be entered among the parties concerning the compensation to be paid to Plaintiffs as well as the parties' mutual and exclusive rights to the Controlling Access Patent.

35.     Two days after the Co-Inventor Agreement was executed, on October 29, 1998, the Controlling Access Patent Application (the "**1998 Patent Application**") was filed with the US Patent and Trademark Office ("USPTO"), a copy of which is attached as Exhibit D hereto.

### The 1999 Controlling Access Settlement

36.     Datum and DDI consummated a merger on or about July 29, 1999, whereby DDI became a wholly owned subsidiary of Datum, upon which merger Datum became the successor-in-interest to all of the rights and responsibilities contemplated by the Co-Inventor Agreement.

37.     In August 1999 a dispute arose between Plaintiffs and Datum concerning various alleged breaches of duties the parties claimed or disputed were owed among them.

38.     Datum filed suit on or about August 20, 1999, based on those disputes, and the parties promptly agreed to settle that litigation.

39.     To settle the 1999 lawsuit, Plaintiffs and Datum entered into two separate settlement agreements in November 1999, one of which is at issue in this lawsuit and is the so-called **Controlling Access Settlement**, a copy of which is attached as Exhibit E.

40.     The Controlling Access Settlement served as the "definitive" agreement between Plaintiffs and Datum concerning the compensation to be paid to Plaintiffs as well as the parties' mutual and exclusive rights to the Controlling Access Patent which was contemplated in 1998 by the Co-Inventor Agreement.

41.     Paragraph 2.2 of the Controlling Access Settlement defined the "Controlling Access Patent" for purposes of that agreement to include the 1998 Patent Application as well as foreign patents pending.

42.     Paragraph 2.3 of the Controlling Access Settlement defined **Phase II Technology** as:

> The method of authentication, encryption and transmission of date/time and/or location data for the purpose of linking together two or more disparate electronic components, such that a trust model is established between them.  Such physical elements must individually be capable of computational and cryptographic functionality, but computationally may be isolated from one another.  Such electronic components must be physically secure, and communicate with each other over communications channel(s) which may themselves be insecure.

43.     Phase II Technology included, and expanded, the technology identified as GPS Phase II technology which had been identified as the property of Plaintiffs in the Co-Inventor Agreement.

COMPLAINT

44.     Pursuant to Paragraph 3.2 of the Controlling Access Settlement, Plaintiffs assigned all rights, title, and interest in the 1998 Patent Application and foreign patents based thereon to Datum.

45.     However, Datum explicitly agreed in Paragraph 3.3 on the Controlling Access Settlement that Plaintiffs, "own[] all rights, title and interest in the Phase II Technology".

46.     Paragraph 3.3 of the Controlling Access Settlement granted Datum a, "perpetual, non-exclusive, irrevocable, assignable, sub-licensable, worldwide license for use of the Phase II Technology and derivatives thereof, with rights to sublicense, in connection with the Confidential Courier product and other products and technology covered by the [1998 Patent Application and foreign patents pending]."

47.     According to the foregoing provisions of the Controlling Access Settlement, Plaintiffs had exclusive rights, title, and interest to Phase II Technology, anywhere in the world, except for the limited rights which Datum had to use that Phase II Technology which was identified in the 1998 Patent Application.

48.     Also according to the foregoing provisions of the Controlling Access Settlement which granted all ownership rights in Phase II Technology to Plaintiffs, subject to Datum's license, Datum had an obligation to protect and maintain any and all patents relating to Phase II Technology to which it was assignee.

49.     Paragraph 3.6 of the Controlling Access Settlement further clarified the parties' intent that Plaintiffs would continue to have the right to commercialize Phase II Technology.

50.     Specifically, Paragraph 3.6 memorialized that Plaintiffs agreed not to, "make, use, or sell any products developed using or derived from the Phase II Technology which also include the technology described in or covered by [Datum's existing Confidential Courier patent]".

COMPLAINT

51.     The above clarifies that Plaintiffs retained all rights to make, use, and sell all Phase II Technology which did not also include the technology described in or covered by the patent covering the Confidential Courier product.

52.     As of the effective date of the Controlling Access Settlement, the 1998 Application had been pending at the US Patent and Trademark Office ("PTO") unchanged from its October 28, 1998, filing date.

**The 2001 Controlling Access Patent Application Expansion**

53.     After the parties executed the Controlling Access Settlement, Datum continued the prosecution of the Controlling Access Patent.

54.     At no time following the execution of the Controlling Access Settlement were Plaintiffs involved in the prosecution of the Controlling Access Patent.

55.     At no time following the execution of the Controlling Access Settlement did Datum ever attempt to include Plaintiffs in the prosecution of the Controlling Access Patent or advise them of the status of that prosecution.

56.     Following a rejection of the developing application for the Controlling Access Patent for anticipation and another for obviousness, Datum radically expanded the amount of Phase II Technology in the independent claims it pursued in the Controlling Access Patent application in its response to office action dated August 20, 2001 (the "**2001 Patent Application Rewrite**"), a copy of which is attached as Exhibit F hereto.

57.     Plaintiffs did not discover the scope and effect of the 2001 Patent Application Rewrite until 2013.

58.     As a result of the 2001 Patent Application Rewrite, each of the independent claims Datum pursued in its application for the Controlling Access Patent included vastly more of

COMPLAINT

Plaintiffs' Phase II Technology than they had ever agreed to license to Datum in the Controlling Access Settlement.

59.     The 2001 Patent Application Rewrite modified Claim 1 to insert Phase II Technology as indicated below in bold and italics:

A method for controlling access to stored information comprising:

Determining an actual geographic position where said stored information is located based on signals received at a receiver supplying reliable position information;

***Cryptographically signing said actual geographic position with a receiver encryption key;***

***Verifying the signature of said actual geographic position;***

Determining that said actual geographic position is within a geographic region within which access to said stored information is authorized; and

Permitting access to said stored information.

60.     The 2001 Patent Application Rewrite modified Claim 12 to insert Phase II Technology as indicated below in bold and italics:

Apparatus for controlling access to stored information comprising:

A receiver supplying reliable position information for determining an actual geographic position where said stored information is located, ***wherein the receiver comprises a receiver encryption mechanism***

COMPLAINT

*providing a receiver encryption key for cryptographically signing data comprising the actual geographic position*; and

A computer for comparing said actual geographic position with a geographic region within which access to said stored information is authorized,

Wherein said computer permits access to said stored information if said actual geographic position is located within said authorized geographic region.

61.     The 2001 Patent Application Rewrite modified Claim 18 to insert Phase II Technology as indicated below in bold and italics:

A method for controlling access to a subset of files belonging to a larger set of files of stored information comprising:

Associating a unique file encryption key with each file from the larger set of files and encrypting the files using the associated encryption keys;

Associating each of the files from the larger set of files with at least one authorized geographic region within which access to said stored information is authorized;

Determining an actual geographic position where said stored information is located based on signals received at a receiver supplying reliable position information;

*Cryptographically signing at least the actual geographic position at the receiver;*

11

COMPLAINT

*Verifying the signature of the actual geographic position;*

Comparing said actual geographic position with said authorized geographic region; and

Providing a file decryption key which authorizes access toad n permits decryption of said files belonging to said subset of files, provided that the actual geographic position is located within the authorized geographic region for the files belonging to said subset of files.

62.     The 2001 Patent Application Rewrite modified Claim 21 to insert Phase II Technology as indicated below in bold and italics:

A method for controlling access to stored information comprising:

Determining an actual date or time at the location of said stored information based on signals received at a receiver supplying reliable time information;

*Cryptographically signing at least the actual date or time at the receiver;*

*Verifying the signature of the actual date or time;*

Comparing said actual date or time with a predetermined date or time interval at which access to said stored information is authorized; and

Permitting access to said stored information if said actual date or time occurs within said authorized date or time interval.

COMPLAINT

63.     The 2001 Patent Application Rewrite modified Claim 25 to insert Phase II
Technology as indicated below in bold and italics:

A method for controlling access to stored information comprising:

Forming a policy associating said information with authorized geographic
regions and authorized time intervals;

Cryptographically signing said policy and said information;

Storing said signed policy together with said signed information;

Providing a password for unlocking said policy;

Determining an actual geographic position where said stored information is
located based on signals received at a receiver supplying reliable position
information;

Determining an actual time;

***Cryptographically signing at least the actual geographic position and the
actual time at the receiver;***

***Verifying the signature of the actual geographic position and the actual
time;***

Comparing said actual geographic position and said actual time with said
authorized geographic regions and authorized time interval of said policy;
and

13

COMPLAINT

Permitting access to said stored information if said actual geographic position and actual time falls within said authorized geographic regions and authorized time interval of said policy.

64.     The 2001 Patent Application Rewrite included a new independent Claim 29 which was entirely comprised of Phase II Technology:

A method for controlling access to stored information, the method comprising:

(a)     Determining a position;

(b)     Cryptographically signing data comprising at least a representation of the position;

(c)     Verifying the signature of the data comprising at least a representation of the position;

(d)     Determining that access to the stored information is authorized at the position;

(e)     Permitting access to the information based at least upon (c) and (d).

65.     The consequence of Datum's radical expansion of the amount of Phase II Technology in the 2001 Patent Application Rewrite was twofold:   first, it was sufficient to convince the PTO to grant a notice of allowance of the application and paved the way for issuance of the patent; and second, it had the effect of subsuming what remained of Plaintiffs' Phase II Technology into the issued Controlling Access Patent.

66.     The Controlling Access Patent ultimately issued as US Patent No. 6,370,629 (the "'**629 Patent**") on April 9, 2002, a copy of which is attached as Exhibit G hereto.

67.     The '629 Patent will be in effect until October 29, 2018.

COMPLAINT

68.    The claims in the 2001 Application Rewrite numbered 12, 18, 21, 25, and 29 were issued verbatim as claims 11, 16, 19, 23, and 27 (respectively) in the '629 Patent.

69.    The 629 Patent contained a significant amount of Phase II Technology which Symmetricom had never compensated Plaintiffs for and which Plaintiffs had free reign to license to third parties.

70.    Datum, and on information and belief later Symmetricom, prosecuted similar patents to the '629 Patent in other jurisdictions around the world.

## Symmetricom's Repudiation Of Plaintiffs' Rights To Phase II Technology

71.    In the years following the issuance of the '629 Patent, Plaintiffs attempted to license their Phase II Technology, as embodied in the '629 Patent, to various third parties.

72.    Datum (hereafter referred to interchangeably with its parent Symmetricom) interfered with Plaintiffs' attempts to do so by refusing to acknowledge the existence or validity of the Controlling Access Settlement until it produced a countersigned copy for the first time in February 2013.

73.    On information and belief, Symmetricom further interfered with Plaintiffs' attempts to license their Phase II Technology by refusing to produce a countersigned copy of the Controlling Access Settlement to Plaintiffs, including refusing to do so in connection with the civil suits relating to the Controlling Access Settlement pending in California Superior Court since 2009.

74.    On information and belief, Symmetricom allowed foreign patents which covered Plaintiffs' Phase II Technology to lapse or become abandoned, despite having the duty to maintain those patents and having knowledge that Plaintiffs relied on them to do so.

COMPLAINT

## COUNT ONE
### (Breach of Controlling Access Settlement by
### 2001 Patent Application Rewrite)

75.     Plaintiffs restate the above as if set out in full herein.

76.     In 1999, Plaintiffs and Symmetricom entered into the Controlling Access Settlement by which they contracted for Symmetricom's license to the portion of Plaintiffs' Phase II Technology which was embodied in the 1998 Patent Application.

77.     The Controlling Access Settlement is still in force and serves as the basis for Symmetricom's continuing claim to be the assignee of the '629 Patent.

78.     In 2001 Symmetricom breached the Controlling Access Settlement, and its license to Phase II Technology embodied therein, with its 2001 Application Rewrite to the USPTO, which resulted in the '629 Patent containing claims which read on Phase II Technology never contemplated by the parties to the Controlling Access Settlement and never licensed to Symmetricom.

79.     As a result of Symmetricom's breach of the Controlling Access Settlement, Plaintiffs have been damaged in the amount of licenses they could have received from the Phase II Technology described in the 2001 Application Rewrite, their expectancy therefrom, and/or their lost profits from the 2002 issue date of the '629 through the life of the '629 Patent which will not expire until 2018.

## COUNT TWO
### (Breach of Controlling Access Settlement For
### Failure to Protect Phase II IP)

80.     Plaintiffs restate the above as if set out fully herein.

COMPLAINT

81.     The Controlling Access Settlement contemplated that certain portions of Plaintiffs' Phase II Technology would fall within the claims of Controlling Access Patent and that Symmetricom would serve as assignee of that patent.

82.     The Controlling Access Settlement also commemorated the fact that Plaintiffs were the sole owners of all Phase II Technology.

83.     As assignee to that Phase II Technology which fell within the Controlling Access Patent, Symmetricom had a duty to protect and maintain all such Phase II Technology, including, without limitation, maintaining all domestic and foreign patent rights thereto.

84.     Symmetricom has breached its duty to maintain the Phase II intellectual property by allowing certain foreign patents covering Plaintiffs' Phase II Technology to lapse.

85.     As a result of Symmetricom's breach of its duty to maintain the patents covering the Phase II Technology, Plaintiffs have been damaged in an amount to be determined at trial.

## COUNT THREE
### (Unjust Enrichment)

86.     Plaintiffs restate the above as if set out fully herein.

87.     In 1999, Plaintiffs and Symmetricom entered into the Controlling Access Settlement by which they contracted for Symmetricom's license to the portion of Plaintiffs' Phase II Technology which was embodied in the 1998 Patent Application.

88.     In 2001 Symmetricom submitted the 2001 Application Rewrite to the USPTO, which resulted in the '629 Patent issuing containing claims which read on Phase II Technology never contemplated by the parties to the Controlling Access Settlement and never licensed to Symmetricom by Plaintiffs.

89.     As a result of Symmetricom's unilateral and unlawful expansion of the scope of the Controlling Access Patent, and its status as assignee of that patent, Symmetricom has been

COMPLAINT

unjustly enriched in the amount that it has benefitted in any way from the Phase II Technology not included in the 1998 Patent Application.

## COUNT FOUR
### (Tortious Interference With Prospective Economic Advantage)

90.     Plaintiffs restate the above as if set out fully herein.

91.     Plaintiffs are the sole owners of Phase II Technology with the limited exceptions of Symmetricom's license rights as delineated in the Controlling Access Settlement.

92.     Symmetricom, as the counterparty to the Controlling Access Settlement, had actual knowledge of Plaintiffs' rights to all Phase II Technology, subject to its limited license rights.

93.     After issuance of the '629 Patent, Plaintiffs attempted to license rights to their Phase II Technology with prospective licensees.

94.     On information and belief, Symmetricom directly interfered with Plaintiffs' attempts to obtain economic advantage from their Phase II Technology by advising prospective licensees that Plaintiffs had no rights to any of the property embodied in the '629 Patent, including all Phase II Technology therein.

95.     Symmetricom likewise repudiated the existence of the Controlling Access Settlement to Plaintiffs and to third parties by, among other things, refusing to produce a fully-executed copy of that agreement until February of 2013.

96.     Symmetricom's direct and indirect actions were wrongful and done with the intent to deprive Plaintiffs of their business expectancy with prospective licensees.

97.     As a result of Symmetricom's tortious interference with their prospective license arrangements, Plaintiffs have been damaged in an amount to be determined at trial.

## COUNT FIVE
### (Declaratory Judgment – '629 Patent Contains Phase II Technology Not Within 1998 Patent Application)

18

98. Plaintiffs restate the above as if set out fully herein.

99. There is an actual controversy as to whether and to what extent the 2001 Application Rewrite and the '629 Patent contain Phase II Technology which was not contemplated by, or incorporated into, the 1998 Patent Application or the Controlling Access Settlement.

100. Plaintiffs request the Court enter a declaratory judgment based upon its construction of the claims of the 2001 Application Rewrite and the '629 Patent and its comparison of them with those in the 1998 Patent Application to delineate with specificity the components of the claims of the 2001 Application Rewrite and the '629 Patent which read on Phase II Technology and are not contained in the 1998 Patent Application.

WHEREFORE, Plaintiffs Michael E. McNeil and Todd S. Glassey request this Court to enter judgment in their favor on all counts, to award them damages in an amount to be determined at trial, to award them declaratory relief to the effect that the 2001 Application Rewrite and the '629 Patent contain Phase II Technology which was not identified in the 1998 Patent Application, and to award them any other relief to which they are entitled.


Respectfully submitted,

**Steburg Law Firm, PC**

<u>/s/ Anita L. Steburg</u>
Anita Steburg

COMPLAINT

**Ross M. Babbitt Co., LPA**

/s/ Ross M. Babbitt
Ross M. Babbitt
Ohio Atty. Reg. No. 0072946
rbabbitt@babbitt-lawfirm.com
700 West St. Clair Avenue
Hoyt Block, Suite 200
Cleveland, OH 44113

Telephone: (216) 623-6346
Facsimile: (216) 274-9683

**Mahany & Ertl**

/s/ Brian Mahany
Brian Mahany
Wisconsin Bar No. 1065623
P.O. Box 511328
Milwaukee WI 53202

Telephone: (414)-223-0464
Facsimile: (414) 223-0472

Attorneys for Plaintiffs Todd S. Glassey and
Michael E. McNeil

COMPLAINT

## **Jury Demand**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury of all issues so triable.


DATED:        October 7,  2013                    STEBURG LAW FIRM, P.C.


                                                    By:     /s/ Anita L. Steburg
                                                            Anita L. Steburg
                                                            Attorney for Plaintiffs

COMPLAINT